# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

GLENIS WILSON,           )
                                   )
            Plaintiff,         )
                                   )
vs.                            )     Case No. 4:10CV01759 AGF
                                   )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,   )
                                   )
           Defendant.       )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Glenis Wilson was not disabled and, thus, not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.§§ 1381-1384f. For the reasons set forth below, the decision of the Commissioner shall be reversed and remanded.

Plaintiff, who was born on August 27, 1963, filed her application for benefits on January 22, 2008, at the age of 44, alleging an initial disability onset date of November 18, 2003, due to a sleep disorder and depression. Plaintiff later amended the alleged onset date to January 22, 2008. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and such a hearing was held on January 11, 2010. By decision dated April 30, 2010, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a cashier and was, therefore, not disabled under the Act.

Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on July 30, 2010. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in finding that Plaintiff had past relevant work as a cashier and improperly weighed the medical evidence in determining Plaintiff's RFC.

## BACKGROUND

### Work History and Application Forms

The record indicates that Plaintiff worked as a cashier at a convenience store from February 1992 to January 1994, earning $5.75 per hour; as a housekeeper at a hotel from March 1994 to January 1995, earning $5.50 per hour; and as a housekeeper at a different hotel from November 1996 to March 1998, earning $6.00 per hour. (Tr. 161-64.)

In the Function Report section of her application for benefits, Plaintiff wrote that due to her impairments, she was unable to iron, do home repairs or car maintenance, mow the law, garden, bank, or go to the post office. She stated that she went shopping once a week, could prepare sandwiches, but did not cook anything that "makes it hot in the kitchen" because that made her faint and "start shaking." On an average day, Plaintiff woke up, showered, ate breakfast, and then went to treatment. She wrote that she was

unable to watch television or read a book because she could not focus and would "go straight to sleep." Plaintiff had a valid driver's license, but did not drive because she did not want to hurt herself or anyone else. (Tr. 171-78.)

In the Disability Report section of her application, Plaintiff wrote that she was 5' 5" tall and weighed 220 pounds, and that she was not currently taking any medications. She stated that she "pass[ed] out regularly" and her "shaking [was] uncontrollable." (Tr. 134-40.) In the Disability Appeal form dated November 17, 2008, requesting a hearing before the ALJ, Plaintiff wrote that she was currently taking Musiden for allergies, Provigil for sleep apnea, and Prozac for depression. (Tr. 186.)

**Medical Record**

On July 2, 2005, Plaintiff reported an episode of syncope and falling on her head. (Tr. 655.) On August 14, 2007, Plaintiff presented to the emergency room, reporting having passed out for seven to eight minutes. (Tr. 244-46). On March 12, 2008, Plaintiff reported that she was "always tired" and could not "stay awake," and on April 30, 2008, she reported chronic problems including sleep issues. Plaintiff stated that she was unable to stay awake and had had this problem for several years. The physician diagnosed narcolepsy and referred Plaintiff to a sleep study. (Tr. 301-03.)

On May 7, 2008, Plaintiff followed-up with Laila Hanna, M.D., noting frequent fainting, including on the day prior, and sleep disturbances. Dr. Hanna diagnosed syncope and chronic bronchitis, prescribed Prilosec and Benzonatate, and recommended

3

that Plaintiff consult with a neurologist. (Tr. 298-300.) On May 22, 2008, Plaintiff

returned to Dr. Hanna with complaints of shoulder pain after falling down two days

earlier. (Tr. 292-94.)

On June 26, 2008, Plaintiff underwent a psychological evaluation by state agency

consultant Karen Hampton, Ph.D., in connection with her application for disability

benefits. Dr. Hampton noted a scar above Plaintiff's left eye that Plaintiff reported was

caused by a seizure and fall. She noted that Plaintiff appeared fatigued by the end of the

hour, and following a mental status examination, diagnosed Plaintiff with depression,

recurrent with psychotic features, seizure disorder, narcolepsy, and a Global Assessment

of Functioning ("GAF") of 49.[1] Dr. Hampton noted that with the help of the drug

rehabilitation program Plaintiff was participating in, it was "very possible" that she might

"improve in aspects of cognitive functioning." (Tr. 319-22.)

On July 29, 2008, Plaintiff underwent a sleep study, and on August 11, 2008,

Adriana Escandon, M.D., diagnosed moderate to severe obstructive sleep apnea and

prescribed CPAP (continuous positive airway pressure) treatment. (Tr. 603-04, 530-31.)

---

[1]   A GAF score represents a clinician's judgment of an individual's overall ability
to function in social, school, or occupational settings, not including impairments due to
physical or environmental limitations. Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment
in reality testing or communication or "major" impairment in social, occupational, or
school functioning; scores of 41-50 reflect "serious" impairment in these functional areas;
scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"
impairment.

On August 15, 2008, state agency non-examining consultant Kyle DeVore, Ph.D., completed a Psychiatric Review Technique form, evaluating Plaintiff's affective disorder (depression with recurrent psychosis). In check-box format, he opined that Plaintiff had mild limitation in activities of daily living, and moderate limitation in social functioning and concentration, persistence and pace. In narrative form, Dr. DeVore wrote that Plaintiff was abstinent (drugs and alcohol) and treatment compliant, and appeared to be able to perform "simple work related tasks with social restrictions." (Tr. 340-51.)

On the same date, Dr. DeVore prepared a Mental RFC Assessment on which he indicated that Plaintiff had no significant restrictions in the ability to understand, remember, and carry out very short and simple instructions; in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in the ability to interact appropriately with the general public; and in the ability to maintain socially appropriate behavior. He noted moderate limitation in understanding, remembering, and carrying out detailed instructions, maintaining concentration for extended periods; working with others without being distracted by them; responding to supervisors; getting along with peers; responding to changes in work setting; and setting realistic goals. (Tr. 352-54.)

A second sleep study conducted on October 6, 2008, revealed obstructive sleep apnea, and Dr. Escandon determined a new optimal level for the CPAP machine. (Tr. 524). The next day, a multiple sleep latency test revealed evidence of pathological

sleepiness and Dr. Escandon diagnosed Plaintiff with hypersomnia. (Tr. 597-98.)

On October 13, 2008, Plaintiff visited Dr. Escandon, complaining of excessive daytime sleepiness. Plaintiff reported that she had been using the CPAP machine for at least seven hours per night, had felt better when she woke up, but continued to be "extremely tired and somnolent during the day." Plaintiff reported that she would fall asleep involuntarily at least once a day, sleep for a few minutes, and then wake up feeling refreshed. Dr. Escandon recommended continued use of the CPAP machine for at least seven to eight hours per night and prescribed Provigil, a stimulant medication. She instructed Plaintiff to follow-up in four weeks. (Tr. 592-94.)

On November 13, 2008, Plaintiff followed up with Dr. Escandon, with continued complaints of obstructive sleep apnea and narcolepsy. Plaintiff reported continued daytime sleepiness despite use of the CPAP machine and Provigil. She explained that the medication improved her sleepiness in the morning, but that the effect wore off around 11:00 a.m. or noon. Dr. Escandon noted that Plaintiff's Epworth Sleepiness Scale rating was 21,[2] instructed Plaintiff to continue the CPAP nightly, and prescribed an increased dosage of Provigil in the morning. (Tr. 589-90.)

On December 9, 2008, Plaintiff went to Hopewell Center and was evaluated by Nestor Muzanila, M.S.W., due to complaints of hearing voices, crying spells, depression,

---

[2]    A test used to determine the level of daytime sleepiness. A score of 10 or more is considered sleepy. A score of 18 or more is considered very sleepy.

"seeing things that are not there," tiredness during the day, and sleep issues. Plaintiff

reported that the issues began five years prior due to her husband's physical and

emotional abuse, at which point she started using crack cocaine and alcohol. Mental

status examination revealed that Plaintiff was sad and upset, with a flat affect, and had

memory deficits. Mr. Muzanila diagnosed major depressive disorder, cocaine abuse in

remission, and a GAF of 50. Plaintiff was prescribed Seroquel. (Tr. 395-99.)

On December 17, 2008, Plaintiff's Epworth Sleepiness Scale rating was 17. (Tr.

585-87.) On the same day, Dr. Escandon prepared a Physical Medical Source Statement.

Dr. Escandon noted uncontrolled daytime sleepiness that would likely cause Plaintiff to

absent from work three or more days per month and arrive late or leave early three or

more days per month. Dr. Escandon indicated that Plaintiff required frequent naps during

the day, as well as more than three breaks, due to multiple involuntary sleep attacks. She

noted an onset date of at least one year prior and stated that Plaintiff's

symptoms/impairment(s) "may improve in the future with medication." (Tr. 373-76.)

From January 4 through January 12, 2009, Plaintiff's nap logs indicated naps every

day, including three times per day on three dates and twice per day on two dates. (Tr.

377-78). On January 29, 2009, Plaintiff followed up with Dr. Escandon due to excessive

daytime sleepiness. Dr. Escandon reviewed Plaintiff's history of obstructive sleep apnea

and narcolepsy without cataplexy. Plaintiff reported that although with use of Provigil

and CPAP her daytime sleepiness was better overall than it used to be, she still

experienced episodes of seven to ten minutes duration during which she could not respond to others even though she was aware of what was going on around her. Plaintiff's Epworth Sleepiness Scale rating was 20. Plaintiff was to continue on Provigil, refrain from driving, and return in four to six weeks. (Tr. 582-83).

On February 13, 2009, Plaintiff followed up at Hopewell Center, reporting that she was still hearing voices. Rolf Krojanker, M.D., increased Seroquel and prescribed Prozac. (Tr. 388). On March 13, 2009, Dr. Krojanker described Plaintiff's apparent daily conversations with a non-existent or non-present sister, fear of being locked up, and fear of hospitalization. (Tr. 387).

Also on March 13, 2009, Dr. Krojanker prepared a Mental Medical Source Statement on which he indicated in check-box format extreme limitation in four of five areas of activities of daily living, including coping with stress, independent functioning and reliability; extreme limitation in public interaction, accepting instruction or criticism, and asking simple questions; marked limitation in relating with family or peers and maintaining socially acceptable behavior; and extreme limitation in all five areas of concentration, persistence and pace. He indicated that Plaintiff would essentially be unable to follow one or two-step instructions or interact appropriately with co-workers, supervisors, or the public. Dr. Krojanker indicated that Plaintiff would require three or more absences per month due to mental symptoms, and would arrive late or leave early three or more times per month. (Tr. 383-86).

On March 16, 2009, Plaintiff followed up with Dr. Escandon due to excessive daytime sleepiness. She reported episodes of sleeping during the day and inability to wake up despite others calling her name. Dr. Escandon noted that Plaintiff's sleepiness continued to be disabling despite medication, prescribed Ritalin, and noted that Plaintiff might benefit from antidepressant medication. Dr. Escandon noted an episode of Plaintiff being unable to remember questions asked during a period of somnolence in the examination three or four minutes prior. (Tr. 579-80.)

On May 11, 2009, Plaintiff missed an appointment at Hopewell Center. (Tr. 612). Nap logs from June 10 through June 18, 2009, and from July 4 through July 10, 2009, again revealed naps nearly every day and on several occasions, twice per day. (Tr. 575-76). On July 13, 2009, Plaintiff followed up regarding her sleep apnea and continued excessive daytime sleepiness. Plaintiff reported that she could not afford Provigil and Ritalin. Continued use of the CPAP machine was recommended, and a generic form of Ritalin was prescribed. (Tr. 577-78).

On December 17, 2009, Plaintiff was diagnosed with continued narcolepsy and daytime sleepiness, and obstructive sleep apnea, and prescribed continued use of the CPAP machine and Ritalin, and use of Xyrem. It was noted that Plaintiff had run out of Ritalin some months ago and did not call for a refill. Plaintiff's Epworth Sleepiness Scale was 22. (Tr. 665-67.)

**Evidentiary Hearing of January 11, 2010 (Tr. 26-46)**

Plaintiff, who was represented by counsel, testified that she had a ninth grade education, was separated from her spouse, and had four children, the youngest aged 16. She lived with her 16-year-old son and stated that, due to a drug problem, she had lost custody of her three other children approximately 17 years earlier. Plaintiff did not have any income. She had graduated from a drug treatment program in May of 2009, and, since then, the program paid her rent as long as she "stay[ed] clean" and continued going to meetings. Plaintiff then discussed her prior jobs as a housekeeper and cashier.

Plaintiff testified that she was unable to work due to being "really, really tired." She explained that heat and certain smells triggered this condition, and it caused her to stop driving out of fear of falling asleep at the wheel. Plaintiff also suffered from chronic asthma and seizures that lasted about 20 minutes. She testified that she had a CPAP machine, and took Ritalin and other medication for blood pressure. The Ritalin caused her to feel "sick" and "crazy" and hallucinate, and her son would have to stay up with her at night to watch over her. Plaintiff stated that the Ritalin had not helped with her seizures.

Plaintiff testified that on a typical day she cried and felt frustrated because she could not do anything since she was always falling asleep. She went to bed around 9:00 p.m., woke up around 4:00 or 5:00 in the morning, and fell back to sleep around 8:00 in the morning. She tried to read, get on the computer, or go to church, but she could not focus and ended up going back to sleep. Plaintiff explained that she fell asleep even

when she was not exposed to heat or chemicals, but that those "really trigger[ed]" her sleepiness. She stated that it had been over two years since she had gone an entire day without an episode of falling asleep.

Plaintiff testified that her sister-in-law drove her to medical appointments and to the hearing because Plaintiff was afraid of falling asleep while driving. She stated that she would fall asleep on the bus going to the grocery store and would miss her stop and that she needed supervision when she cooked. Plaintiff recounted an incident in 2001 or 2002 when she was watching her grandchildren, fell asleep while cooking, and "burnt up" her daughter's house.

Plaintiff stated that she used energy drinks to keep herself awake but that they only worked for a week or two before her body would get used to it. She also tried adjusting her sleeping habits, but she would still fall asleep during the day.

A vocational expert ("VE") testified that Plaintiff had never worked at the substantial gainful activity level, but had worked as a cashier "often enough to have learned how to do [it]." The ALJ asked the VE to consider a hypothetical person of Plaintiff's age and education who had no medically determinable impairments that directly caused any exertional limitations; should have no prolonged exposure to extreme heat or pulmonary irritants; could not climb at dangerous, unprotected heights or be around dangerous, unprotected, moving machinery; could have only superficial interaction with coworkers, supervisors, and the general public; and could independently

11

perform tasks working primarily with things, rather than other people.  The VE testified that such an individual could perform the work of a cashier, hand packager, fast food counter worker, and small product assembler.  The VE noted that these jobs existed in significant number in both the local and national economies.  The VE testified that if such a person would fall asleep or exhibit seizure-like behavior at unpredictable times when she was supposed to be working, the person would be terminated.

**ALJ's Decision of April 30, 2010 (Tr. 8-18)**

The ALJ found that Plaintiff had severe impairments of obstructive sleep apnea, narcolepsy, and depression, but that she did not suffer from an impairment or combination of impairments of a severity that met or medically equaled the severity of a deemed-disabling impairment listed in the Commissioner's regulations.  The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: no prolonged exposure to extreme heat or pulmonary irritants; no exposure to dangerous unprotected moving machinery, unprotected heights, or other hazards; only tasks that could be performed independently and that involved primarily working with things rather than people; and only superficial social interaction with co-workers, supervisors and the general public.

The ALJ acknowledged Plaintiff's GAF of 50 in December 2008, but stated that her condition "would be expected to improve with ongoing treatment" and that such a GAF did not represent Plaintiff's "expected long-term future level of functioning."  The

ALJ gave "diminished weight" to Plaintiff's reports of psychotic symptoms at Hopewell

Center because she had just a few appointments there and "poor" treatment follow-up,

and because Plaintiff did not exhibit signs of psychosis to any other medical sources.  The

ALJ characterized Plaintiff's depression as moderate and stated that psychotic symptoms

were inconsistent with the observations of treating physicians.

The ALJ stated that Plaintiff's frequency of naps appeared to diminish over time,

that "further improvement" could be expected over time with continued treatment

compliance, and that Plaintiff's nap logs were not representative of the level of

functioning "that could be expected with prescribed treatment," adding that Plaintiff had

not yet been following prescribed treatment for 12 continuous months.

The ALJ found that Plaintiff's statements regarding her symptoms were not

credible to the extent that they were inconsistent with the ALJ's RFC determination.  The

ALJ noted that Plaintiff's allegation that she had not worked since 2002 was not

consistent with her earnings records, which showed more than $3,000 in earnings in

2006-2007.

The ALJ stated that the treatment notes from Plaintiff's physicians did not confirm

Plaintiff's complaints of involuntarily falling asleep.  The ALJ stated that he "could not

find that Plaintiff is expected to continue falling asleep with the frequency she claims in

the logs because she had not taken prescribed medication for any 12-month period, and

has not yet exhausted possible treatment options."  Additionally, the ALJ noted that no

physician had concluded that the degree of daytime somnolence alleged in Plaintiff's nap logs was expected to persist.

The ALJ gave "significant weight" to the opinion of Dr. DeVore and rejected the Medical Source Statement of Dr. Escandon because it was not "representative of [Plaintiff's] expected long term functioning." The ALJ gave "little or no weight" to Dr. Krojanker's March 13, 2009 opinion that Plaintiff was extremely limited, due to Dr. Krojanker's infrequent appointments with Plaintiff, Plaintiff's presentation to him that "differed significantly from her presentation to all other medical sources," Plaintiff's failure to seek psychiatric treatment thereafter, and her failure to testify about or exhibit psychosis at the hearing.

The ALJ found that, because Plaintiff had not taken prescribed medications consistently and had not yet exhausted treatment options, no work-related limitations in terms of work absenteeism or work interruptions could be found. The ALJ observed that at the close of the hearing, Plaintiff's eyes closed about halfway and then about two-thirds of the way, and Plaintiff did not respond to her attorney for approximately one minute. The ALJ noted that no medical source had documented any similar occurrence.

The ALJ found that Plaintiff was able to perform her past relevant work as a cashier, noting that Plaintiff had maintained employment at this job "for a period of time sufficient to master the skills required." The ALJ held, alternatively, that Plaintiff could perform the jobs identified by the VE -- hand packager, fast food counter worker, and

small product assembler.  Therefore, the ALJ found that Plaintiff was not disabled.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole." *Johnson v. Astrue*,  628 F.3d 991, 992 (8th Cir.  2011) (quoting another source).  The court "may not reverse . . . merely because substantial evidence would support a contrary outcome.  Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is

engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. Otherwise, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience. *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011). This burden can be met with the testimony of a vocational expert in response to a hypothetical question that takes into account all of the claimant's impairment that the ALJ properly finds are supported by the record. *Martise v.*

*Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

**Past Relevant Work**

Plaintiff correctly argues that the ALJ erred in considering Plaintiff's work as a cashier to be "past relevant work" under the Commissioner's regulations, which require that to constitute past relevant work the work had to have been done at the substantial gainful activity level. *See* 20 C.F.R. § 416.960(b)(1). Accordingly, the Court focuses on the ALJ's alternative holding at step five of the evaluation process that there were other jobs Plaintiff could perform.

**ALJ's Assessment of Plaintiff's RFC / Weight Accorded to Medical Opinions**

Plaintiff argues that the ALJ's assessment of her RFC was in error because it did not include the limitations noted in Dr. Escandon's December 17, 2008 Physical Medical Source Statement, nor the limitations noted in Dr. Krojanker's March 13, 2009 Mental Medical Source Statement. Plaintiff further argues that the ALJ's findings that Plaintiff's GAF would improve and that her nap logs were not representative of the level of functioning to be expected with continued prescribed treatment was improper speculation, not supported by medical evidence. Plaintiff argues that it was reversible error for the ALJ to give significant weight to the opinion of Dr. DeVore, who was a non-treating non-examining source, while rejecting the opinions of treating physicians, Drs. Escandon and Krojanker.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982) (en banc), *abrogated on other grounds in Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Id*. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. *Id*. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" *Id.* at 1023 (quoting *Hutsell v. Massanari*, 259 F.3d 7, 711 (8th Cir. 2001)).

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d).

The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). A treating physician's opinion that is inconsistent with the physician's own treatment notes or the record as a whole need not be credited by an ALJ. *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).

Here the Court concludes that the ALJ improperly discounted the opinions of Dr. Escandon with regard to Plaintiff's work-related limitations due to her sleep disorder. As noted above, Dr. Escandon opined on December 17, 2008, that Plaintiff's sleep disorders would likely cause Plaintiff to absent from work three or more days per month, arrive late or leave early three or more days per month, and require more than three breaks per day, whereas the ALJ determined that Plaintiff would have no absenteeism or work interruptions due to her sleep disorder. The only support provided by the ALJ for his finding on this matter is his assumption that Plaintiff's symptoms would improve over time. However, even taking into account Dr. Escandon's statement that Plaintiff's symptoms "may improve in the future with medications," there is no medical support in the record that the work-related limitations found by Dr. Escandon would not persist for at least 12 months with treatment. Indeed, as of December 17, 2009, Plaintiff's Epworth Sleepiness Scale rating was 22 with continued use of CPAP.

Plaintiff appears to have been compliant with the prescribed treatment for her sleep disorder since July 2008, with the exception of not taking Ritalin for approximately two months in late 2009. But Plaintiff explained that Ritalin had not helped her and caused severe side effects. Treatment notes from July 13, 2009, show that even when on Ritalin, Plaintiff's Sleepiness Scale rating was 17. Also as noted above, the ALJ stated that no medical source had documented an episode of involuntary sleepiness, but on March 16, 2009, Dr. Escandon documented such an episode.

"'An administrative law judge may not draw upon his own inferences from medical reports.'" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)); *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974) (same). "Speculation [by an ALJ that the claimant's condition would improve] is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." *Clark-Woods v. Astrue*, No. 4:10CV1377 FRB, 2011 WL 3607558, at *12 (E.D. Mo. Aug. 12, 2011) (quoting another source).

A similar problem exists with the ALJ's speculation that Plaintiff's GAF would improve in the future. As such, the ALJ's opinion cannot be affirmed and the case must be remanded for further consideration. Upon remand, the record should be further developed to determine whether Plaintiff should be granted a period of disability and/or continuing benefits due to physical or mental impairments.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED** and **REMANDED**.

A separate Judgment shall accompany this Memorandum and Order.


         *Audrey G. Fleissig*
         AUDREY G. FLEISSIG
         UNITED STATES DISTRICT JUDGE

Dated on this 30th day of September, 2011